Our last argued case today is MCDAVID KNEE GUARD v. NIKE You can't ask us to pick everything confidential. No, I do. I'm with you. I'm with you. Mr. Fink. Good morning, Your Honors, and may it please the Court. We appeal the denial of the plenary injunction because we believe the Court erred in the finding of no likelihood of success on the merits. And that issue, we believe, revolves around the claim construction issue. We also believe the Court set the bar too high and erred in finding that there was no likelihood of irreparable harm to McDavid in this case. Focusing on the claim construction issue, the jig is the term that was in dispute. The Court held that the jig... Well, Mr. Brookstein, a Nikes expert, says that any person of skill in the art would understand that the jig can't be the material you're working on. But didn't Mr. Beal, your expert, also agree that the jig would not include material that is part of the work product? Actually, no, Your Honor. What he was asked was if the definition of jig specifically... If you look anywhere and find a definition, does it specifically say that a jig would include any other material that you're working on? He said, no, that's not... You wouldn't find that in a dictionary. But the meaning of the term jig that you would find in a dictionary is that it's anything that holds the work pieces. It's silent as to whether or not that jig could be made out of certain material that's part of the work process. What really happened is... But when we're assessing just likelihoods, we've already got something that appears to be fairly characterized as at least a close question. Why would we question the District Court's assessment of likelihood here on appeal? Well, the claim construction issue, Your Honor, we would submit is manifestly erroneous. And it's something you reviewed in OVO anyway. And in this case... Where's the manifest error? That will help us. Well, if you look at the intrinsic and extrinsic evidence, there is literally nothing to say that the jig, either as used in the court by one ordinary skill, ordinary needing for in this particular patent... The jig provided, right? Yeah, the jig provided is what the... It really comes down to... I thought I'd better raise it because it's their strongest argument. I'm sorry? It's their strongest argument, isn't it? They say the jig, if it's the material that's already there, it's already provided, so it's not a jig. Well, yes, that's their strongest argument. That's what the court relied on and... So you need to torpedo that. Well, here's how we torpedo that, Your Honor. Jig provided is the third paragraph in this four-paragraph claim. The first paragraph is providing a sheet of material. The second is providing a sheet and a cutter. The third is making one side of the element stand proud of the surface of the jig. And the fourth is the bonding of the material. Jig provided is in the third paragraph. There is literally nothing there to suggest that that would exclude excess material. And if you wanted to read these paragraphs as mutually exclusive in the steps, you would actually read out the preferred embodiment. Take a look at the cutter. The cutter is used in the second paragraph for cutting. And then later on, it's in the second paragraph, cutting the sheet using a cutter. And then later on, it talks about the jig provided. The jig is understood to be the cutter. It's the preferred embodiment. That explains that the sheet is pressed down onto the cutter instead of the cutter being pressed down on the sheet, which is what I'm supposed to talk about, right? Right, right. But it doesn't drive, you know, because of the secret. Right, right. But the point of it is that jig provided is, any reading of this would say that it's whatever the jig is, the way the judge read it, it can be anything but the excess material. But how is excess material provided, to return to Judge Clevenger's point? How is excess material provided? It's there already. Well, it's there only after the cutting step. The cutting step then. The spec says the excess material is removed. In that preferred embodiment, that's true. Yeah, it's removed. It can't be the jig if it's been removed. You certainly can't limit the scope of the claim to that. Right, but there's no embodiment that shows the excess material being left there to perform as a jig. Right. There's no specific definition that says the jig must not be the excess material. But the parties agreed and the court found that jig provided is defined in functional terms as to what it does, namely hold material. I would analogize this as to the difference between a cup and a glass. A cup sort of defines a function of holding something. It doesn't say what the material is. A glass would imply the material. Here, the jig is just essentially a generic term that's really a functional term. Well, basically what we're trying to decide is whether the jig is structure that sort of pre-exists, that is separate from the material. And the patent talks in terms of if you have a really irregularly shaped item, some odd thing, then what will you do? You will have a specially constructed jig, specially constructed. So it suggests to me that an ordinary jig is constructed. And if you have an odd form, you have a specially constructed jig. Your Honor, it sounds like that supports our argument that the jig provided can be either specially constructed or it can be the cutter as opposed to the spacer. No, but it suggests to me that the jig is a constructed item. You know, if it's an ordinary piece, it has an ordinary construct. If it's a special piece, it's specially constructed. Well, that's not what the ordinary meaning is. And in terms of the specification, parting from the ordinary meaning, that was certainly... I don't think anybody is disagreeing with you that in the real world, the excess material could perform as a jig. I don't even think I could disagree with that. It could. The question is, was this patent written to reach that? Or was this patent instead talking about a jig that is something that is separate from the material, constructed for a particular purpose, right? Other things after you have pushed the cutter down on top of the material. And it doesn't matter what you start with a presumption of. You start with a presumption of ordinary meaning of the term jig. The ordinary meaning of the term jig would not be exclusive of material or a part of the workpiece that's separate from the workpiece you're working on. We even cited some other patents that show that jig is often used to mean other parts of the material that are being worked on. The patent involving the watch that had the block in it that becomes a piece of the watch. It's also functioned as a jig during construction. Mr. Fink? Excuse me. Perhaps we're going to say this. I was going to ask if you'd take a moment or two to talk about the irreparable harm aspect. Certainly, Your Honor. We think the bar was set too high and the evidence is there that irreparable harm was, in fact, happening. The district court focused on the fact that our client didn't have a loss of overall sales and overall market share at the time it filed the motion for preliminary injunction. But what Mr. Fink did testify to in a sworn declaration to be accepted here is that the key customers of McDavid, the universities that buy these pads for their football players, and, by the way, they're virtually identical. They're essentially the identical product. They're being sold to the identical customers, which are McDavid's key university customers in the retail market. And we've listed numerous universities who had actually told McDavid, sorry, we're stopping. We're reducing sales now because I can see the product and some of those universities actually had exclusive contracts that required them to switch. And McDavid's a small company. It built a business of $300,000 to $9 million a year, invested $4 million in marketing and sales. And for the giant, the self-proclaimed world's leading supplier of sports apparel to come in and steal its customers, it seems to me, Your Honor, that that speaks of irreparable harm. And I don't think there are any cases that this court has decided, including any of the ones that have been cited in the briefing, where there were actual facts like this and the court agreed that there was no irreparable harm. Okay. I'll save the rest. You'll save the rest? That'll be fine. Mr. Rookwich, you're doing double time today. Yes, thank you for that opportunity. Before I start into my merits argument, there are two facts that the court might find relevant, I think should be disclosed to the court. Fact number one is that McDavid surrendered its 325 patent in favor of a reissued patent and amended its complaint in the action below to assert the reissued patent, including asserting some newly added claims that were added in the reissued patent. As a result, Chief Judge Holderman dismissed Nike's then-pending summary judgment as moot. And I just want to tell you our position is that this appeal is not moot because this appeal only involves claims from the original patent that are carried over into the reissued patent unchanged. And so it doesn't really affect this appeal at all, but I felt the court should know that. The other fact that I think the court should know is we had identified a related case in our brief, McDavid and Sterling against Adidas. That case has now been dismissed, and Adidas continues to sell padded compression garments in the marketplace. So that's really the preliminary points that I wanted to make sure that the court knew about for facts that have changed since we filed our brief. Would the ordinary meaning of jig exclude a work piece? Yes, because the court looked at two things in determining that. First, it looked at the dictionary definitions to try and identify what the ordinary meaning is. And we have a little snafu here because what they're really talking about is a fixture, not a jig. The definitions of jig say it's a device provided to hold the work piece. And also a jig guides the cutting tool. But the experts agreed, no, they were using jig to mean fixture, which is a device that holds the work piece. And so you have two separate things, a device to hold the work piece. That can either be a piece of tooling or, in the case of the Sterling patent that McDavid is asserting here, the cutter, which is actually separate from the work piece. So we have two disclosed devices in the patent that are separate from the work piece, and that's consistent with the dictionary definitions of a device to hold the work piece. And Mr. Brookstein, Dr. Brookstein, explained why. He said that the jig is used in production manufacturing to ensure consistency from piece to piece. And therefore, you don't use part of the piece itself. You use a separate piece of tooling or, in this special device, in this Sterling patent, you can use the cutter itself. And counsel has suggested an argument to the district court, well, there are two patents out there that show that a part of the work piece is being used as a jig. And Chief Judge Holderman very correctly identified the problem with that argument. Because he pointed out, no, it didn't say that these pieces were jigs, but that they performed a jig-like function. And the fact that those patents had to point that out actually showed that one of ordinary skill in the art wouldn't have construed those pieces as a jig. So Chief Judge Holderman saw that argument, he saw the evidence of the dictionary definitions, he saw the evidence of the expert testimony, and he looked at the intrinsic evidence, the patent claim language requiring that that jig be provided in a step that was separate from providing the sheet. He looked at the way it was used in the written description of the patent, where the jig was always something separate from the work piece. It was either a specially constructed jig or it was the cutter itself. And he looked at the prosecution history where the examiner in the reasons for allowance talked about the jig and he talked about the sheet of material. Mr. Rickledge, in one of the embodiments, the cutter itself becomes the jig. And so we have the instance where the cutter, which is already present in the process, is acting as the jig. Why doesn't that support Mr. Fink's argument that the excess material already present in the process could also act as the jig? I think what that suggests more is that there were some problems in the claim you're acting, but because it is separate from, the cutter is separate from the material, it supports our position, consistent with our position throughout. It somewhat detracts from our argument about the plain language of the claims. We agree, the claims are not artfully drafted at all. But all the other evidence about the meaning to one of ordinary skill, both taken from the dictionary definitions and from Dr. Brookstein explaining why it's a separate device, that being consistent within the patent that the jig was always separate from the work piece, gave the judge more than enough evidence. One of the other claim limitations is that the material must stand proud of the jig. Does that help or hurt you? Well, it's a completely separate argument. But what they're arguing is that these individual elements extend up above the waste foam, and that therefore the waste foam is separate from the individual elements, and it acts to hold that together. But the problem is, it's this whole sheet that's subjected to the manufacturing process. The sheet of material has the adhesive laid on both sides, the cutter punches through it, and then the workers by hand, if you look at the video tape, strip the adhesive off the interstitial areas, the waste foam, so you get something that looks like this. If you strip it off, why doesn't the whole sheet come off when they're stripping it off? I couldn't figure out how they managed just to get the stuff that's in the hole out. Because the cutter has punched through the adhesive, so if you grab it on the end, it's just the interstitial foam, and pull on that, the cut is so clean it will leave the adhesive on those individual elements. So what happens then is this whole sheet is subjected to the rest of the manufacturing process. In other words, the fabric is placed on top of the sheet, and it's run through the heat press, all of it, the elements and the interstitial waste foam. So it all goes through the heat press together, and the heat and the pressure are applied to the elements and to the waste foam together. The only reason the waste foam doesn't adhere to the fabric is because it doesn't have any adhesive on it. So it's a very different process. It's not just slight of hand and some kind of semantic trickery, but what it is, instead of... I wasn't suggesting that, Mr. Ripley. Instead of tearing off the waste foam like is disclosed in the patent, or in the other embodiment with the specially constructed jig, taking the elements out and putting it in the jig, the workers manually stripped the adhesive off the interstitial elements. So it's a very different structure. And so what happens, because when this goes through the heat press, all of this stuff is on here, necessarily what's going to happen is there's no standing craft because it's compressed down to, as we explained, 50 to 2 thirds, 50% to 66% of its thickness. There is no standing craft because it's all smashed flat. So it's a long answer to a short question. Right. Standing craft before and during and after peeling off the excess sticky material, but then when you squash it, the proud element is lost. Exactly right. And the whole purpose of the standing proud in this invention is so that you have a height differential between the foam elements and the jig. And if you had adhesive up there and you applied that so it didn't stand proud, you'd have the fabric attached to your jig. And that's what you don't want. So the whole crux of this invention is the height differential, standing proud allows you to adhere to the elements and only to the elements. And this approach is a completely different approach. But it's not a reverse doctrine of equivalence type situation. The reverse doctrine of equivalence has yet to be raised in this case. Thank you. And we prefer that it not be. Of course, I can understand that, Mr. Roof. But it just struck me as it's just the image in the mirror. There's no question from the declaration of Daniel Kim, who is the pad supplier to Nike's garment supplier in Taiwan, who then supplies the garment to Nike. So it's really Nike's supplier's supplier that is performing this method. And his declaration at page 895 through 902 of the appendix explains exactly how this works and the infringement. Now, is that embargoed if we have to write an opinion in this case? Where the confidential is slapped all over these briefs and the interesting video we got is confidential. Correct. And, Your Honor, I just disclosed in open court, as I really had to, the fact that the interstitial foams peel off in a manual process. So that's certainly not embargoed. There are other details of his process that are included in there that we prefer, for example, the court not publish the video of the process with its opinion. But I think, frankly, the court can go ahead. And you're saying we've exercised our good judgment as to how much detail we need to use in describing the accused method? Absolutely, Your Honor. Absolutely. So we've identified two reasons that the district court reasonably could have found that there was no infringement. And the district court relied on the fact that there is no jig. And that... Do you want to talk a little bit about any irreparable harm? Absolutely, Your Honor. McDavid has provided no evidence beyond conclusory and speculative statements about... About the so-called theft of their customers. The so-called theft of their customers. Nike has exclusive arrangements with a number of universities where it pays an awful lot of money and supplies an awful lot of products to these universities for them to use Nike product. McDavid is in there selling lots of those products to the same universities. McDavid is primarily a sports medical company. And what McDavid has said is that Nike has stolen its customers because it enforced the contractual obligation for those universities to buy Nike or to use a Nike product if a Nike product is available. And Nike could have made any kind of padded compression short available to its exclusive universities. And they would have had to have used that. There is no nexus between the alleged infringement by Nike's supplier's supplier, this process, and the product that Nike is coming in and having its universities use. The fact that these are contractually bound universities is irrelevant. That was relevant to McDavid's claims of unfair competition and those claims have been ruled against on summary judgment by Chief Judge Holderman. So our perception is this whole argument about stealing customers is just an artifact from their unfair competition claim. The question is not stealing their customers, but whether or not you are prohibiting their access to your customers. Well, no, we're certainly not prohibiting their access. They're still in those locker rooms and what they're searching for You're saying if you have a Nike product, these universities have to buy it from you. Correct. But they're in those same locker rooms with a lot of different products and they haven't said that it's in any way affected the sales of other products or it's in any way harmed their relationship. But the suit isn't about those other products. The suit is about these two competitive products that you're selling that are virtually identical and they're saying, well, we were selling to these universities and then Nike comes along and elbows us out. Correct. And Nike has every... And they say your product is infringing. Well... I mean, assuming, for purposes of argument, the product was infringing. Well, it's... Assuming it was flipped and the only thing you had to stand on was no irreparable harm. Assuming there was a likelihood of success on the merits in this case. So the question is... And then take his stolen client offer and run it through irreparable harm. Well, the question is, what is the irreparable harm? Is it lost sales? No. They're seeking damages for every single one of those lost sales. So it must be something more than lost sales. And they haven't alleged anything other than that. They're still in those same locker rooms. There's no evidence that it's hurt their other sales or their relationships with those universities. Their sales have increased. Their overall sales have increased. Their team sales have increased. Their retail sales have increased. So you might need products that are not relevant, not similar to the products that we're talking about. No, no. That's sales of these products. That's what the evidence is. The sales of these products has increased. The sales of these products to teams have increased. And the sales of these products to retail has increased. Nike has injected a whole bunch of advertising into this market. And that rising tide has lifted all boats. And I think that unless there was some other evidence of what the irreparable harm was, other than purely those lost sales, it's not irreparable. And there is no such evidence. Thank you, Mr. Woodward. Mr. Fink, you have over five minutes remaining. In several places, Mr. Fink, column four, column five, it says the excess material from between the elements is removed. So doesn't that, again, suggest that the district court got it pretty correct? In preferred embodiment, that's true, Your Honor. But we recognize that there's a different process being used by the infringer here. But the jig is instead of being the cutter, which is previously provided in the claim, is now the excess material that was cut from the sheet of material that was previously provided in the claim. All they've done is substituted the excess material for the cutter as the jig. And there's nothing in the ordinary meeting that would escape that. The idea that somehow the experts have explained this in a way, that may be one expert's view, but the dictionary definition, the agreement of the parties is the jig is a functional term used that way in the patent. And, in fact, Judge Haldeman so found, but then he got derailed, focusing on whether or not this jig provided meant that he couldn't have the material from an earlier step and use it in a later step. And that's simply inconsistent with the idea, as you pointed out, the cutter is provided in an earlier step and is also used as the jig later. On the irreparable harm, what I heard essentially admits the irreparable harm, as far as I can tell, because there's no doubt now that we're losing our customers, that the customer relationships... You're losing a customer for a particular product. You aren't being barred from walking... No, we're talking about this product. We're being replaced by Nike for this product, which is a Marquis product, as attested to in the declaration. And this issue of whether customer relationships are being affected, of course they are when you get kicked out on a sale of your Marquis product. And Nike's own briefing we submit essentially admits that. They say that if you were on the other foot and they are adjoined and they get kicked out, that they're going to be damaged with their credibility and their customer relationships. It seems to me that that confirms our claim and proves our case that irreparable harm will inevitably occur in the customer relationships. On the standing crowd, we talked about that. It's important to know that we put a still shot in our brief. You have the videos. The sample that we saw today is different. It's different because those elements are not standing proud, like in the videos and in the still shot and what we saw when we went to Korea. The standing crowd occurs because injectors push the cut elements out of the cutters, and when they do that, they move each of the elements slightly above. I don't understand Mr. Ripley's to be saying that his product didn't have standing proud at some stage in the process. I thought he was trying to explain that in the final product, it's all smooth, it's squashed. I think he said to the extent that there had been previous standing proud, it doesn't have to be a foot crowd, right? It's just higher than. Okay. On that point, Your Honor, two things. One, the district court found that there doesn't have to be standing proud during bonding, and that makes sense because there isn't even standing proud during bonding in this patent. In the disclosure of this patent, the elements rise slightly above the cutter, and when you press down the platen, the hot press to press down the fabric and compress and make a connection to the elements, they compress down into the cutter as well. So there is no standing proud during bonding, and even the patentees own disclosed preferred embodiment, and there need not be any preferred in the accused process as well. Thank you, Your Honor. Thank you, Mr. Fink. All rise. Your Honor, the court is adjourned until this afternoon at 2 p.m.